WILLIAM J. SILBERMAN AND JANE SILBERMAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Silberman v. Commissioner
Docket Nos. 2088-80, 2089-80, 5293-80, 5294-80, 5295-80, 5296-80, 5297-80, 5298-80, 5626-80.
United States Tax Court
T.C. Memo 1983-782; 1983 Tax Ct. Memo LEXIS 4; 47 T.C.M. (CCH) 778; T.C.M. (RIA) 83782; December 28, 1983. Thomas A. McKinney and David Waldman, for the petitioners. Marwin A. Batt, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes as follows: Taxable
Docket No.
Petitioners
Year Ending
Amount
2088-80
Silberman
12/31/75
$3,351.89
2089-80
Giordano
12/31/75
987.00
5293-80
Wisotsky
12/31/75
1,242.00
5294-80
Wein, Inc.
3/31/76
50,010.64
5295-80
Sole
12/31/75
1,621.73
5296-80
Henderson
12/31/75
4,297.27
5297-80
Leone
12/31/75
948.19
5298-80
Malanka
12/31/75
33,337.00
12/31/76
14,554.00
5626-80
Stamato
12/31/75
13,779.00
12/31/76
17,556.00
*8 Respondent alternatively claimed an increase in deficiencies should this Court decide certain issues, as discussed below, adversely to him. [2]
The issues for decision are: (1) whether Communion Productions entered into the transaction of producing a motion picture for profit; (2) whether the partnership's use of the cash receipts and disbursements method of accounting was proper or, in the alternative, whether respondent may require capitalization of expenses to avoid distortion of income; and (3) whether various petitioners were in *9 fact partners in Communion Productions at the times when various items of partnership income or expense were received or incurred. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners William J. Silberman and Jane Silberman resided in Wyckoff, New Jersey, when they filed their petition in this case. Petitioner Theresa Giordano resided in Clifton, New Jersey, when she filed her petition in this case. Petitioners Charles Wisotsky and Eva Wisotsky resided in Paterson, New Jersey, when they filed their petition in this case. Petitioner David Wein, Inc. was a corporation with the principal place of business at Paterson, New Jersey, when it filed its petition in this case. Petitioners Alfred Sole and Rosalyn Sole resided in Hackensack, New Jersey, when they filed their petition in this case. Petitioners Robert R. Henderson and Diane Henderson resided in Bedminster, New Jersey, when they filed their petition in this case. Petitioners Frank Leone and Kathleen Leone resided in Kinnelon, New Jersey, when they filed their petition in this case. *10 Petitioners Daniel Malanka and Philomena Malanka resided in Union City, New Jersey, when they filed their petition in this case. Petitioner Jacqueline Stamato resided in Essex Fells, New Jersey, when she filed her petition in this case. All petitioners filed their respective Federal income tax returns for the years in issue with the Internal Revenue Service Center at Holtsville, New York. On or about May 14, 1975, a document entitled "Limited Partnership Agreement" (hereinafter "the agreement") was executed by Alfred Sole (hereinafter "Sole"), general partner, and Richard K. Rosenberg (hereinafter "Rosenberg") and David Waldman (hereinafter "Waldman"), limited partners, under the laws of the State of New Jersey. Under the terms of the agreement, the name of the limited partnership was to be Communion Productions (hereinafter "the partnership") and the partnership was to exist until May 14, 1989. The agreement provided that additional partners could be admitted only with the consent of the general partner. The agreement, together with a certificate of limited partnership, was duly recorded with the Passaic County Clerk's office on July 8, 1975. Under the terms of the agreement, *11 all partners were to share equally in the profits at 33 1/3 percent each. Each of the two limited partners was to receive 45 percent of the losses, and the general partner was to receive 10 percent of the losses. Several subsequent changes in the composition of the partnership occurred. A first amendment to the agreement was executed on December 12, 1975, and filed with the Passaic County Clerk's office on December 31, 1975. Thereunder, Rosenberg was removed as a limited partner. Rosenberg had been a nominal partner only, in order to permit formation of the partnership. The following petitioners were added as limited partners under the first amendment to the agreement: Daniel Malanka, Robert Henderson, William J. Silberman, Frank Leone, Charles Wisotsky, Jacqueline Stamato, and Theresa Giordano. Under the terms of the first amendment to the agreement, each limited partner was entitled to profits of three times his or her capital investment and to losses of two times his or her capital investment. A second amendment to the agreement was executed on December 15, 1975, but was not filed with the Passaic County clerk's office until October 19, 1977. This second amendment added *12 petitioner David Wein, Inc., as a limited partner. On December 20, 1975, a document entitled "Sale of Limited Partnership Interest" was executed. Thereunder, Waldman was removed as a partner of the partnership. The capital investments made by each of the limited partners [3] were as follows: Petitioner
Amount
Date
Silberman
$5,000.00
June 10, 1975
Giordano
5,000.00
October 1, 1975
Wisotsky
5,000.00
July 22, 1975
David Wein, Inc.
50,000.00
December 29, 1975
Henderson
5,000.00
June 11, 1975
Leone
5,000.00
July 18, 1975
Malanka
30,000.00
$15,000.00 on each
of May 27, 1975 and
September 22, 1975
Stamato
25,000.00
July 3, 1975
The purpose of the partnership, as stated in the agreement, was "to engage in the business of producing and selling motion pictures." Pursuant to this purpose, the partnership entered into a production agreement with Rand Productions (hereinafter "Rand") on May 15, 1975. *13 Under the terms of the production agreement, the partnership was to produce a motion picture photoplay entitled "Communion" (hereinafter "Communion" or "the motion picture"). The agreed specifications required that the motion picture be filmed in technicolor, be a full-length film with a running time between 90 and 120 minutes, and be produced for a budget estimated between $1,000,000.00 and $1,500,000.00. Principal photography of "Communion" was to commence not later than June 1, 1975, and the motion picture was to be delivered to Rand not later than December 15, 1975. The essential elements of the production were set forth in the production agreement. "Communion" was to be based on an original screenplay by Alfred Sole and Rosemary Puglia Ritvo. The individual producer was to be Rosenberg, and the director was to be Sole. The principal stars, as well as the composer and lyricist, were named in the production agreement. [4]
The producer, Rosenberg, was also an attorney. *14 In this capacity, he formed the partnership and his office also prepared the production agreement with Rand. Although his brother was a shareholder of Rand, Rosenberg held no interest in Rand. Rosenberg had a previous attorney-client relationship with Sole. By his own admission, Rosenberg did not actively produce motion pictures prior to "Communion". However, he had some experience in the business and was involved with many people, including Sole and others, in various aspects of the process. Rosenberg took an active role in the production of "Communion". Before undertaking the project, he consulted with experts in the motion picture business, including people familiar with Sole's work as a director. He was involved with all production aspects and problems of "Communion". Furthermore, both before and since the production of "Communion", Rosenberg has been involved in preproduction of a variety of motion picture projects. As respondent himself acknowledges on brief, Rosenberg produced "Communion". We find that Rosenberg was the individual producer of "Communion". Sole, the director, had directed at least two motion pictures prior to "Communion": "American Soap" and "Deep *15 Sleep". "Deep Sleep" had achieved some notoriety as a "risque" film, but had also enjoyed a measure of artistic acclaim. "Communion" itself enjoyed a degree of critical success. It received numerous awards, including winning the Virgin Islands Film Festival and the Chicago Film Festival. "Communion" was reviewed in several publications, including "Variety" and the "London Times". It was voted one of England's top ten pictures when released there in 1977. We find that Sole was the director of "Communion". The partnership complied with all terms of the production agreement, including adherence to the estimated budget. At least $1,050,000.00 was expended by the partnership in the production of "Communion". In addition to setting forth the above and other details of the partnership's responsibility for the production of "Communion", the production agreement also provided that Rand had and was to have all distribution and ownership rights in the motion picture. Furthermore, the production agreement required payment by Rand to the partnership as consideration for the partnership's production of "Communion". The payment terms were as follows: The total sum which has been agreed *16 to pursuant to Paragraph 6.01 [of the production agreement] is the gross sum of $1,635,500.00. Said sum shall be payable as follows: A. By cash or check on or
before December 31, 1975
$110,000.00
B. By the execution of a
non-recourse, non-negotiable
Promissory Note payable
on or before January 1, 1986,
and providing for interest
payable at six (6%) per cent
per annum. The Borrower agrees
to reduce the principal balance
of said obligation to the extent
of proceeds received from the
sale and/or distribution of the
Film. The Borrower shall have
the right to prepay any part or
all of the principal obligation
without penalty or charge at
any time prior to the due
date
$1,525,500.00
TOTAL
$1,635,500.00
The partnership relied on four sources of funding to finance the production of "Communion": (1) A total of $130,000.00 was contributed by the limited partners; (2) Rand paid $110,000.00 as required by the terms of the aforementioned provision of the production agreement; (3) Harristown Funding (hereinafter "Harristown") lent $134,750.00 to the partnership on a nonrecourse basis, said loan being secured by a Security Agreement. Harristown was *17 formed on May 17, 1975, as a limited partnership in which Rosenberg was the general partner; and (4) Various loans were made to the partnership by the Bank of Passaic and Clifton and the Valley National Bank. The Bank of Passaic and Clifton lent a total of $100,000.00 to the partnership, as evidenced by a series of promissory notes: $35,000.00 on August 6, 1975; $15,000.00 on August 20, 1975; $25,000.00 on September 2, 1975; and $25,000.00 on October 3, 1975. These loans were unsecured and were made on a nonrecourse basis. All of these notes were signed by Sole and Rosenberg for the partnership, and were endorsed by Frank Stamato, Sr., [5] Rosenberg, and Waldman. In addition, the partnership borrowed $90,000.00 from Valley National Bank on an unsecured, nonrecourse promissory note dated August 2, 1976.. This note was signed by Sole and Rosenberg for the partnership, and was endorsed by Frank Stamato, Rosenberg, and David Wein, Inc. by Frank Zak. All notes from both banks bore interest at stated rates of 8, 8 1/4 or 8 1/2 percent per annum. On July 7, 1975, Rand and Harristown entered into an agreement whereunder *18 Rand agreed to sell all of its rights in "Communion" to Harristown. The sale resulted from Rand's inability to raise capital necessary to advance funds to the partnership to complete production of "Communion". The total purchase price to be paid by Harristown, arrived at through negotiations, was $2,850,000.00. The payment terms were as follows: A. By cash or certified check
on or before December 31,
1975, the sum of
$110,000.00
B. By the execution of a non-recourse,
non-negotiable
Promissory Note in the amount
of $2,740,000.00 payable on or
before June 30, 1987, with interest
at 6 percent per annum.
The Borrower agrees to reduce the
principal balance of said obligation
to the extent of proceeds
received from the sale and/or
distribution of the property as
follows: 1. 100 per cent of the first
$500,000 received
$500,000.00
2. 75 per cent of the next
$500,000 received
375,000.00
3. 31.4706 per cent of the
next $1,700,000.00
received
535,000.00
4. 37.5 per cent of the next
$3,546,667.00 received
330,000.00
Total of Note Payments
$2,740,000.00
The Borrower shall have the
right to prepay any part or
all of the principal obligagation
without penalty or
charge at any time prior to
the due date.
TOTAL CONSIDERATION
$2,850,000.00
*19 The motion picture was retitled on various occasions and was alternatively known as "Communion", "Alice, Sweet Alice", and "Holy Terror". [6]. Between May 14, 1975, and April of 1980, "Communion" received gross revenues of almost $2,000,000.00. During February and March of 1982, it was shown on HBO, cable television. The distributor of "Communion" was Allied Artists Corporation of New York (hereinafter "Allied"). In 1979, Allied filed for bankruptcy, said action being pending before the Bankruptcy Court in the Southern District of New York as of the trial date of the instant case. As a result of Allied's action, neither Harristown nor, in turn, the partnership realized profits from "Communion" in the amounts they had anticipated. The partnership reported its income on the cash receipts and disbursements method. It filed its partnership returns, Forms 1065, for the calendar years ending December 31, 1975, and December 31, 1976. Thereon, it reported the following information: 1975
Total Income
$110,000.00
Total Deductions
$475,692.00
Ordinary Loss
$365,692.00
1976
Insurance Recovery of
Production Expenses
$ 45,296.00
Total Income
$ 45,296.00
Total Deductions
$168,604.00
Ordinary Loss
$123,308.00
*20 Petitioners in the instant case deducted their individual shares of ordinary losses on their respective tax returns. In his notices of deficiency, respondent disallowed these deductions on the grounds that the production of "Communion" by the partnership was not a transaction entered into for profit and, in the alternative, that current production expenses must be capitalized by the partnership. Furthermore, respondent challenged the partner status of various petitioners as of the time when income or expense items were received or incurred. OPINION Section 183(a)[7] provides the general rule that if any individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to a profit objective, such as interest or taxes, shall be allowed; and section 183(b)(2) provides that deductions *21 which would be allowable only if the activity is engaged in for profit shall be allowed, but only to the extent that the gross income from the activity exceeds the deductions otherwise allowable under section 183(b)(1). In determining whether a profit objective was present, we must examine the facts at the partnership level. Brannen v. Commissioner,78 T.C. 471 (1982). The burden of proving the requisite intent is on petitioners. Golanty v. Commissioner,72 T.C. 411 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981); Rule 142(a), Tax Court Rules of Practice and Procedure. Although it is not necessary that a taxpayer's profit intention be reasonable as measured by business or other standards, the taxpayer must demonstrate an actual and honest profit objective. Dreicer v. Commissioner,78 T.C. 642, 644 (1982), affd. in an unpublished opinion *22 (D.C. Cir. Feb. 22, 1983); see also section 1.183-2(a), Income Tax Regs.
Determination of whether the necessary objective existed is to be made on the basis of all the facts and circumstances of a particular case. Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Greater weight should be given to objective facts than to mere statements of intent. Dreicer v. Commissioner,supra at 645; Engdahl v. Commissioner,72 T.C. 659, 666 (1979); see also section 1.183-2(a), Income Tax Regs.
The applicable regulations list a series of factors to be considered in making the determination. Section 1.183-2(b), Income Tax Regs. These factors are as follows: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; *23 (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9), whether elements of personal pleasure or recreation are involved. In evaluating these factors, none are conclusive and a mere counting of competing factors is not sufficient. Dunn v. Commissioner,supra at 720; see also section 1.183-2(b), Income Tax Regs. Rather, the importance of any factor must be evaluated in the context of a particular case. After evaluating the facts and circumstances of the instant case in the context of the above enumerated factors, we find that the partnership did have a profit objective within the meaning of section 183. The following factors lead us to this conclusion: The partnership conducted its activities in a business-like manner.It maintained books and records adequate to support our finding of proper conduct. It executed and, where appropriate, filed tax returns, partnership agreements and amendments thereto, notes evidencing *24 bank loans, and agreements between itself, Rand, and Harristown. The partnership adhered to the terms of the production agreement in a professional manner and succeeded in meeting all requirements thereof. The active participants in the business of the partnership, i.e., the production of "Communion", were familar with the business of motion picture producing and directing and had sufficient expertise in that field. They devoted considerable amounts of their time, effort, and talent to the production of "Communion". Respondent suggests that Rosenberg lacked expertise because he had not previously functioned in the role of individual producer of a motion picture. Taken to its logical extreme, respondent's reasoning would prevent any taxpayer from ever entering into an untried business venture, because any initial effort would not be backed by identical previous experience. Such is not the requirement of section 183. Although "Communion" was Rosenberg's first effort at the producer level, his previous experience in many aspects of the motion picture business and the expertise of the director, performers, and other professionals with whom he surrounded himself lend credence to *25 his status as a producer. Respondent also argues that Sole, the director, lacked expertise as a director. Respondent describes Sole's earlier films as "risque". Whether or not this adjective may be apt, it does not controvert the facts that Sole had directed at least two previous motion pictures and had enjoyed a measure of critical success. Nor does it distract from the professional reputation which Sole apparently had attained, as evidenced by Rosenberg's decision to hire him as a director only after conferring with others in the business who were familar with Sole's work. Furthermore, the success of "Communion" itself in attracting favorable review and revenue further attests to the expertise of those who produced and directed it. It is true that "Communion" did not ultimately generate profits in the amounts anticipated by the partnership. This failure, however, can be attributed to the unanticipated bankruptcy of Allied. This intervening and unforeseen fact does not negate the profit objective of the partnership upon entry into the venture of producing "Communion". Section 183 does not require the realization of profit, but only its honest and actual anticipation. Respondent *26 argues that any profit to the partnership or, in turn, to its partners, was impossible under the financial structure of the agreement with Rand and, subsequently, with Harristown. Our examination of the arrangement belies this conclusion. As Rosenberg explained in his testimony at trial, estimated receipts from "Communion" were in excess of $6,000,000.00, including both box office receipts and film rentals. The difference between the cost of production and the $635,000.00 by which the purchase price paid by Harristown exceeded $1,000,000.00 would supply enough funds to provide an anticipated profit to the partners approaching three times the amounts of their capital investments. Elements of personal pleasure or recreation are nonexistent insofar as the record discloses, except in the sense that one may professionally enjoy one's vocation. If this factor were intended to influence the balance, however, it would tip the scales in the cases of all but dissatisfied professionals and disgruntled employees. We decline, therefore, under these circumstances, to use the fact that Rosenberg and Sole apparently enjoyed their chosen lines of work to support an inference that a profit objective *27 was lacking.
Certain other of the enumerated factors of section 1.183-2(b), Income Tax Regs., e.g., the financial status of the taxpayer, are neutral in the context of the instant case and do not enter into our balancing of factors. Having examined those factors which are persuasive here, as explained above, we conclude that the partnership entered into the business of producing "Communion" with the objective of making a profit.Therefore, we find that the limitations imposed by section 183 do not apply. Having decided the section 183 controversy in favor of petitioners, we turn now to determination of the section 446 question. The cash receipts and disbursements method of accounting, as adopted and employed by the partnership, is a generally permissible method of accounting. It is, in fact, among the methods specifically sanctioned by section 446(c). [8] Furthermore, under the general rule of section 446(a), "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. *28 " As the partnership used the cash method in its own bookkeeping, its use in computing taxable income is generally proper. However, section 446(b) provides exceptions to this general rule. It states in relevant part: [I]f the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.
In the instant case, current deduction of expenses creates a distortion of income because the receipt of income attributable to expenses is postponed until the film is completed and distributed. Hence expenses and receipts are not matched in a manner which *29 clearly reflects income. Rather, current expenses result only in the creation of the right to future income from the distribution of the film. Under these circumstances, respondent's insistence that expenses be capitalized, rather than deducted, is justified. This result was set forth in our dicta in the case of Estate of Helliwell v. Commissioner,77 T.C. 964 (1981). In that case, unlike the one now before us, the taxpayer was found not to have been the actual producer of films. However, while finding the issue inapplicable to the taxpayer in Estate of Helliwell, we explained the results which would ensue in transactions "* * * where investore combine with the owner of an artistic property to produce such property as a play or motion picture." Estate of Helliwell v. Commission,supra at 990. We stated: Such an arrangement usually takes the form of a limited partnership, with the owner of the artistic property as general partner and the investors as limited partners, or a joint venture, with the owner of the artistic property as one co-venturer and a partnership composed of the investors as the other co-venturer. If so structured, any *30 deductions (and income) would be divided among the partners/coventurers and, since both partners/co-venturers would have an ownership interest in the artistic property, the cost of producing such property would most likely have to be capitalized and recovered through depreciation. * * * Estate of Helliwell v. Commissioner,supra at 990-991; see also secs. 1.263(a)-1, 1.263(a)-2(b), Income Tax Regs. We adopt such reasoning as sound in the case before us. In the case now before us, the overwhelming majority of expenses attributable to the production of "Communion" could be anticipated to occur between the entry into the production agreement between the partnership and Rand on or about May 14, 1975, and the targeted delivery date of the motion picture under that contract on December 15, 1975. By contrast, any income to be generated by "Communion" could not be expected until sometime after the delivery date. In fact, the extended period of income realization was reflected in the termination date of the partnership agreement, May 14, 1989. The predicted delay between expenditures and receipts creates a mismatching of funds and a distortion of income of the *31 type which section 446(b) intends to avoid. Under these circumstances, the cash receipts and disbursements method of accounting does not clearly reflect income, and the respondent's denial of its use is proper. Finally, we turn to the issue of whether various petitioners were in fact partners in the partnership at the times when various items of partnership income or expense were received or incurred. Respondent seems to suggest that the failure to timely file the amendments to the agreement negates the existence of the partnership. Such argument is not on point. For while delays in filing of amendments may interfere with the status of petitioners as limited partners vis-a-vis creditors of the partnership under applicable laws of New Jersey, [9] the existence of the partnership for tax purposes is not affected thereby. Thus, the issue is not one of partnership existence or membership; rather, it is one of allocation of profits and losses among partners.
Section 701 sets forth the general rule that partners are subject to income tax only in their separate capacities. *32 The taxable income of a partner is to be computed within the taxable year of the partner which includes the end of any taxable year of the partnership. Section 706(a); see Smith v. Commission,331 F.2d 298 (7th Cir. 1964); Foxman v. Commissioner,41 T.C. 535 (1964). The allocation of a partner's share of income or loss is ordinarily to be made in accordance with the provisions of the partnership agreement. Section 704(a); Delchamps v. Commissioner,13 T.C. 281 (1949). However, the allocations set forth in a partnership agreement, or any item thereof, may be disregarded where substantial economic effect is lacking. Section 1.704-1(b)(2), Income Tax Regs.[10]
Where partnership membership changes during a partnership taxable year, allocations among partners is problematic. *33 Section 706(c) attempts to resolve these problems. Section 706(c)(1) provides that a partnership taxable year shall not close as a result of the addition of a new partner, the death of a partner, or the liquidation or the sale or exchange of a partnership interest. See section 1.706-1(c)(1), Income Tax Regs. However, section 706(c)(2) provides for the tax consequences to partners whose interests are affected by changes in partnership membership.It states: (2) PARTNER WHO RETIRES OR SELLS INTEREST IN PARTNERSHIP.-- (A) DISPOSITION OF ENTIRE INTEREST.--The taxable year of a partnership shall close-- (i) with respect to a partner who sells or exchanges his entire interest in a partnership, and (ii) with respect to a partner whose interest is liquidated, except that the taxable year of a partnership with respect to a partner who dies shall not close prior to the end of the partnership's taxable year. Such partner's distributive share of items described in section 702(a) for such year shall be determined, under *34 regulations prescribed by the Secretary or his delegate, for the period ending with such sale, exchange, or liquidation. (B) DISPOSITION OF LESS THAN ENTIRE INTEREST.--The taxable year of a partnership shall not close (other than at the end of a partnership's taxable year as determined under subsection (b)(1)) with respect to a partner who sells or exchanges less than his entire interest in the partnership or with respect to a partner whose interest is reduced, but such partner's distributive share of items described in section 702(a) shall be determined by taking into account his varying interests in the partnership during the taxable year. [Emphasis supplied.] See section 1.706-1(c)(1), (2), (3), Income Tax Regs.
The impact of section 706(c)(2)(B) upon both the transferor and the transferee of a partnership interest was well-expressed in our opinion in Moore v. Commissioner,70 T.C. 1024, 1031-1032 (1978). Therein we stated: Where a partner sells or exchanges less than his entire interest, section 706(c)(2)(B) requires that the transferor partner determine *35 his distributive share "by taking into account his varying interests in the partnership during the taxable year." Sec. 1.706-1(c)(4), Income Tax Regs. It follows that the transferee's distributive share must also be determined by taking into account his varying interests in the partnership. See generally H. Rept. 94-658, 1976-3 C.B. (Vol. 2) 695, 815-816; S. Rept. 94-938, 1976-3 C.B. (Vol. 3) 49, 96. Since a partner who transfers his entire interest is required to report his distributive share of partnership items for the period he was a partner and cannot transfer retroactively those items to the transferee, it is reasonable to conclude that Congress intended for the transferor and transferee of a partial interest to determine the variation in their interests in the same manner. There is no reason to believe Congress intended to allow the transferor of a partial interest to assign his distributive share of partnership items occurring before the transfer and deny a similar privilege to the transferor of an entire interest. Consequently, we conclude that when there is a transfer of a partial partnership interest, section 706(c)(2)(B) *36 requires the transferor to report his distributive share of partnership items for the period before the transfer, requires the transferor and transferee to report their distributive shares of partnership items for the period after the transfer, and prohibits the retroactive shifting of such interests. [Emphasis in original.] In the case now before us, we hold that petitioners became partners in the partnership as of the various dates of capital contribution as set forth in our findings of fact; to wit: June 10, 1975, for Silberman; October 1, 1975, for Giordano; July 22, 1975, for Wisotsky; December 29, 1975, for David Wein, Inc.; June 11, 1975, for Henderson; July 18, 1975, for Leone; May 27, 1975, and September 22, 1975, for Malanka; and July 3, 1975, for Stamato. Thus, no changes in partnership membership occurred during partnership taxable year 1976, and the allocations as set forth in the partnership agreement will be respected. During partnership taxable year 1975, however, several changes in partnership membership occurred. Two of the three original partners, Rosenberg and Waldman, transferred their interests in the partnership by amendment to the partnership agreement *37 or by execution of a document entitled "Sale of Limited Partnership Interest." Furthermore, all petitioners in this case were added as partners at various dates throughout the partnership taxable year. The allocation of interests among the three original partners [11] was amended to reflect the allocations included in the amendments to the partnership agreement.[12] Under these circumstances, section 706(c)(2)(B) requires that distributive shares of partnership items must be allocated to reflect the changing membership of the partnership during taxable year 1975. See Richardson v. Commissioner,76 T.C. 512 (1981), affd. 693 F.2d 1189 (5th Cir. 1982); Moore v. Commissioner,supra;Rodman v. Commissioner,T.C. Memo. 1973-277. See also Hawkins v. Commissioner,713 F.2d 347 (8th Cir. 1983); Williams v. United States,680 F.2d 382 (5th Cir. 1982); Snell v. United States,680 F.2d 545 (8th Cir. 1982); Lipke v. Commissioner,81 T.C. 689 (1983). *38 We have considered the other arguments both of petitioners and of respondent, and we find them unpersuasive.
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Theresa Giordano, Docket No. 2089-80; Charles Wisotsky and Eva Wisotsky, Docket No. 5293-80; David Wein, Inc., Docket No. 5294-80; Alfred Sole and Rosalyn Sole, Docket No. 5295-80; Robert R. Henderson and Diane Henderson, Docket No. 5296-80; Frank Leone and Kathleen Leone, Docket No. 5297-80; Daniel Malanka and Philomena Malanka, Docket No. 5298-80; and Jacqueline Stamato, Docket No. 5626-80.↩
2. Although unclear, respondent apparently argues that, should he lose his section 183 argument but prevail in his position as to section 446, the resulting capitalization of expenses will cause a decrease of current deductions and hence an increase of taxable income. Such increase, however, would be less than the increase which would result if respondent were sustained as to section 183. Thus, the amounts of deficiencies already asserted are sufficient to encompass any increases in tax under the described circumstances. In any event, this matter will be resolved by the computation under Rule 155, Tax Court Rules of Practice and Procedure.↩
3. The record contains no evidence of any monetary contribution by the general partner, petitioner Sole. Apparently, his contribution consisted of his services as a motion picture director, as to which see infra,↩ this opinion.
4. "Communion" starred Linda Miller and Niles McMaster, among others. In addition, it featured a cameo appearance by Lillian Roth and was the first motion picture in which Brooke Shields appeared.↩
5. Frank Stamato, Sr. is not a petitioner in this case.↩
6. In addition, it was shown in France under its translated title of "Alice, Douce Alice".↩
7. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
8. Section 446(c) provides: Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting: (1) the cash receipts and disbursements method; (2) an accrual method; (3) any other method permitted by this chapter; or (4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary or his delegate.↩
9. This possibility is beyond the scope of the instant case, and we render no opinion thereon.↩
10. The requirement of "substantial economic effect" has been included in the Code itself since 1976. See sec. 704(b)(2). Even before that statutory modification, however, similar language was included in the then-applicable regulation, as cited above.↩
11. All partners were to share equally in the profits at 33 1/3 percent each. Each of the two limited partners was to receive 45 percent of the losses, and the general partner was to receive 10 percent of the losses. ↩
12. Each limited partner was entitled to profits of three times his or her capital investment and to losses of two times his or her capital investment.↩